## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| LMCHH PCP LLC, *et al.*,[1] | ) | Case No. 17-10201 (LSS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Ref. Docket No. 8** |

### INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105(a), 362(d), 363(b), 364(c)(1), 364(c)(2), 364(c)(3) AND 364(e) AND (B) USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363(c)(2)(A) AND (II) SCHEDULING FINAL HEARING

Upon the Motion[2] of the debtors and debtors in possession (the "**Debtors**") for entry of interim and final orders, pursuant to Bankruptcy Code Sections 105(a), 362(d), 363(b), 363(c)(2)(A), 364(c)(1), 364(c)(2), 364(c)(3) and 364(e), Bankruptcy Rules 2002, 4001 and 6004 and Local Rules 2002-1 and 4001-2, authorizing the Debtors to, among other things, (i) incur postpetition indebtedness, (ii) grant security interests, and (iii) use cash collateral (the "**Motion**"); and the Debtors having, more specifically sought entry of this Interim Order:

(a)       approving the Debtors' entry into the Debtor-in-Possession Loan and Security Agreement attached to the Motion as Exhibit A (the "**DIP Loan Agreement**") and authorizing Debtors to borrow from time to time, up to $4.2 million (the "**DIP Loan**") from MedCare Investment Fund V, L.P. ("**MedCare**," and in its capacity as the lender under the DIP Loan Agreement, the "**DIP Lender**") subject to the Budget attached hereto as presented in Court at the end of February 3, 2017 hearing (as the same may be

---

[1]       The last four digits of the taxpayer identification numbers for each of the Debtors follow in parenthesis: (i) LMCHH PCP LLC (8569); and (ii) Louisiana Medical Center and Heart Hospital, LLC (7298).  The mailing address for both of the Debtors is 64030 Highway 434, Lacombe, LA  70445.

[2]       Capitalized terms used but not defined herein shall have the same meaning ascribed to them in the Motion or the DIP Loan Agreement, as applicable.

amended or supplemented from time to time in accordance with the DIP Loan Agreement) with an interim initial funding of $1,000,000;

(b)    affording the DIP Lender the protections of Bankruptcy Code Sections 364(c)(1), 364(c)(2) and 364(c)(3);

(c)    confirming the DIP Lender's good faith in furnishing the DIP Loans and the attendant applicability of the protections afforded by Bankruptcy Code Section 364(e);

(d)    authorizing the Debtors to use the cash collateral, as defined in Bankruptcy Code Section 363(a) (the "**Cash Collateral**"), of MidCap Funding IV Trust (formerly known as MidCap Funding IV, LLC), the successor-by-assignment to MidCap Funding Trust (formerly known as MidCap Financial, LLC) ("**MidCap**"), and provide adequate protection by, among other things, paying down MidCap's existing prepetition senior secured claim and providing MidCap with adequate protection liens, as described below;

(e)    modifying the automatic stay imposed by Bankruptcy Code Section 362 solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Agreement and this Interim Order

(f)    waiving any applicable stay, including under Bankruptcy Rule 6004 and any applicable Local Rules, and providing for immediate effectiveness of this Interim Order;

(g)    scheduling a final hearing on the Motion to be held within twenty (20) days after the Petition Date (the "**Final Hearing**") to consider entry of a final order that grants all of the relief requested in the Motion on a final basis (the "**Final Order**"); and

(h)     authorizing the DIP Lender to terminate the commitment of the DIP Lender to make the DIP Loans (the "**Commitment**") on the terms set forth in the DIP Loan Agreement and this Interim Order, including upon the occurrence and during the continuance of an "Event of Default" under the DIP Loan Agreement and declare the DIP Loans then outstanding to be due and payable.

After notice and a hearing held on February 3, 2017, and due deliberation after receiving evidence and argument, and good and sufficient cause appearing therefor,

**IT IS HEREBY FOUND** that:

A.     This Court has jurisdiction over the Chapter 11 Case and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is properly before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

B.     An interim hearing on the Motion was held and concluded before this Court on February 3, 2017 (the "**Interim Hearing**") and based on the record presented to the Court by the Debtors, the interim relief requested in the Motion is in the best interests of the Debtors' estate, its creditors and other parties in interest and is necessary to avoid immediate and irreparable harm to the Debtors' pending the Final Hearing and otherwise is fair and reasonable and is essential for the continued operation of the Debtors' business.

C.     The Debtors Stipulate that MedCare, the proposed DIP Lender, is an affiliate of the Debtors, and another MedCare affiliate, Cardiovascular Care Group, Inc. ("**CCG**"), is a creditor and an affiliate of the Debtors. Subsequent to CCG's acquisition of Louisiana Medical Center and Heart Hospital, LLC ("**LHH**"), which owns and operates Louisiana Heart Hospital (the "**Hospital**"), CCG provided supplemental working capital to the Debtors pursuant to that

3

certain Demand Note between CCG and LHH in the initial principal amount of $15 million (as amended over time, the "**CCG Demand Note**"). The CCG Demand Note has since been amended on five (5) occasions to increase the face amount of the note. As of the Petition Date, the principal amounts owing under the CCG Demand Note totaled approximately $104 million. The CCG Demand Note is due upon demand and is unsecured.

D.    The Debtors Stipulate that in 2004, prior to the acquisition of the Hospital by CCG (the "**Acquisition**"), MedCath Finance Company and LHH entered into that certain Real Estate Note and Loan Agreement (the "**MedCath Note**" and collectively with all amendments, restatements, supplements, modifications, mortgages, assignments of leases and rents and other related documents, the "**MedCath Loan Documents**") to refinance the construction loan incurred to construct the Hospital. The MedCath Note and the other MedCath Loan Documents are secured by a mortgage in the Hospital and two medical office buildings pursuant to that certain Mortgage, Assignment of Lease and Rents and Security Agreement between MedCath and LHH (the "**MedCath Mortgage**").  Immediately prior to the Acquisition, LHH was indebted to MedCath in an amount totaling $81,431,000. In connection with the Acquisition, MedCath converted a portion of the indebtedness owing to MedCath into equity in LHH, thereby increasing its ownership interest to approximately 95.4% of the outstanding membership interests in LHH and, with certain working capital adjustments, reducing the outstanding amount owing to MedCath to $21,763,903.  The MedCath debt, purchased by CCG as part of the Acquisition, remains outstanding and accrues interest monthly at a fixed rate of 7.50%.

E.    The Debtors stipulate that in 2014, LHH entered into a revolving line of credit with MidCap in the amount of $12,000,000 (the "**MidCap Revolver**").  The MidCap Revolver bears interest at a variable rate based on the greater of the 1-month LIBOR rate or 1.50% plus an

4

applicable margin of 4.25%. The amounts owing under the MidCap Revolver (the "**MidCap Indebtedness**") are secured with a first-priority lien on substantially all of the Debtors' assets. In connection with the MidCap Revolver, the MedCath Note and the MedCath Mortgage held by CCG were subordinated to the MidCap Indebtedness and MidCap liens.

F.    The Debtors stipulate that, as of the Petition Date, the MidCap Indebtedness totaled approximately $6,729.460.83.

G.    The Debtors have historically been dependent on support from CCG and its predecessors. In the absence of immediate access to the DIP Loans the Debtors will be unable to bear the costs and expenses of the Chapter 11 Case, the value of the estate will deteriorate rapidly, and serious and irreparable harm to the Debtors, its estate and other interested parties will occur, thus preventing the Debtors from realizing their chapter 11 objectives.

H.    Given (a) the nature of and risks associated with the Debtors' business, and (b) that the Debtors do not have material unencumbered assets, the Debtors do not believe that third-party debtor-in-possession financing is available from any other lenders on more attractive terms than the DIP Loan being provided by the DIP Lender.

I.    Financing on a postpetition basis is not otherwise available without the Debtors' securing, pursuant to Bankruptcy Code Sections 364(c)(2) and 364(c)(3), such indebtedness and obligations with Liens on and security interests in the DIP Collateral as described below, subject to the Carve-Out.

J.    No trustee, examiner, or creditors' committee has been appointed in these Chapter 11 cases. The Debtors have served notice of this Motion on (a) the United States Trustee; (b) those creditors holding the twenty (20) largest unsecured claims; (c) the Internal Revenue

Service; (d) MedCare; (e) MidCap; and (f) CCG. The Debtors submit that no other or further notice need be provided.

K.      Based on the record presented to the Court by the Debtors at the Interim Hearing, the DIP Loan Agreement has been negotiated in good faith and at arm's length between the Debtors and the DIP Lender, and any credit extended, issued or made to the Debtors pursuant to the DIP Loan Agreement shall be deemed to have been extended, issued or made, as the case may be, in good faith as required by, and within the meaning of Bankruptcy Code Section 364(e).

L.      Based on the record presented to the Court by the Debtors at the Interim Hearing, the terms of the DIP Loan are fair and reasonable, reflect the Debtors' exercise of prudent business judgment, consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

M.      The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2). The Motion and this Interim Order comply with Local Rule 4001-2. The permission granted herein to enter into the DIP Loan Agreement on the interim terms contained herein and to obtain funds thereunder on an interim basis pending the Final Hearing and entry of the Final Order is necessary to avoid immediate and irreparable harm to the Debtors. This Court concludes that entry of this Interim Order is in the best interest of the Debtors' estate and its creditors and other stakeholders as its implementation will, *inter alia*, allow for the Debtors to pay the costs and expenses of the Chapter 11 Case, preserve the value of the Debtors' assets and enhance the Debtors' prospects of realizing its chapter 11 objectives.

Based upon the foregoing findings and conclusions, and upon the record made before this Court by the Debtors at the Interim Hearing, and good and sufficient cause appearing therefore;

6

**IT IS HEREBY ORDERED** that:

1.     The Motion is granted on an interim basis, subject to the terms and conditions set forth herein.  Any objections to the Motion that have not previously been withdrawn or resolved are hereby overruled on their merits.  To the extent any provisions in this Interim Order conflict with any provisions of the DIP Loan Agreement, the provisions of this Interim Order shall control and govern to the extent of such conflict.

2.     The Debtors are expressly authorized and empowered to execute and deliver to the DIP Lender the DIP Loan Agreement and to obtain the DIP Loans.  Additionally, the Debtors are authorized and directed to comply with and perform all of the terms and conditions of the DIP Loan Agreement and to repay amounts borrowed with interest to the DIP Lender in accordance with and subject to the terms and conditions set forth in the DIP Loan Agreement and this Interim Order.

3.     The Debtors are expressly authorized to borrow from the DIP Lender, on the terms and subject to the conditions set forth in the DIP Loan Agreement and this Interim Order, up to $1.0 million in principal in the aggregate, subject to further borrowing requests as may be authorized at the Final Hearing and in a Final Order.  The Debtors are authorized to use the proceeds of the DIP Loan and Cash Collateral for working capital needs and for general corporate purposes, in accordance with the terms of the DIP Loan Agreement and this Interim Order and will only be used to pay, when due, the expenses set forth in the Budget (subject to the Variance).

4.     The Debtors are expressly authorized to grant MidCap replacement liens in the same collateral generated post-petition (i.e. accounts receivable), which, in addition to the existing value of MidCap's collateral in excess of the MidCap debt, plus the payments of

adequate protection payments to be applied to the principal and interest on the MidCap debt,

provide MidCap adequate protection for the use of its Cash Collateral by the Debtors.

5.      The Debtors are expressly ~~authorized~~ *directed* to pay to MidCap ~~30% of the collections~~ *adequate protection payments such* *Totaling $2,597,000* ~~of the accounts receivable in which MidCap has a senior lien and security interest (such amounts shall be used to reduce the principal and accrued and unpaid interest of MidCap's senior secured debt). Additionally, the Debtors are authorized to pay to MidCap $439,500.00 in Cash Collateral presently held by the Debtors.~~

6.      MedCare as the DIP Lender, shall be granted liens in all of the Debtor's assets subject only to any existing liens and security interests, and the MidCap replacement liens, except that such liens shall be senior to the existing lien and security interests of CCG (defined below) which is subordinated to the MidCap liens in the real property owned by the Debtors.

7.      By Tuesday of each week, Debtors shall provide MedCare as the DIP Lender and MidCap (a) a weekly reconciliation of the Budget to actual performance for the immediately preceding week, showing the percentage variances, if any, for each line item on the Budget.

8.      The liens on and security interests in the DIP Collateral, including a lien on the Hospital real estate, granted pursuant to this Interim Order and the DIP Loan Agreement shall be referred to as the "**DIP Liens**." The DIP Liens are deemed to constitute valid, enforceable, unavoidable and duly perfected security interests and liens, and neither MidCap nor the DIP Lender are required to file or serve financing statements, notices of lien or similar instruments which otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the Debtors to execute any documentation relating to the DIP Liens and MidCap

8

adequate protections liens does not affect the validity, enforceability, unavoidability, perfection or priority of the DIP Liens or the MidCap adequate protections liens. If, however, the DIP Lender or MidCap shall determine to file any such financing statements, notices of lien or similar instruments, or to otherwise confirm perfection of such DIP Liens or adequate protection liens to MidCap, the Debtors are directed to cooperate with and assist in such process. For the avoidance of doubt, the DIP Liens do not include liens on Avoidance Actions. The stay imposed by Bankruptcy Code Section 362(a) is hereby modified to allow the filing and recording of a certified copy of this Interim Order or any such financing statements, notices of lien or similar instruments, and all such documents shall be deemed to have been filed or recorded at the time of and on the date this Court enters this Interim Order.

9.      The DIP Liens and other rights, benefits, and remedies granted under this Interim Order to the DIP Lender shall continue and be enforceable, for all purposes, in the Chapter 11 Case, and (a) shall not be subject to Bankruptcy Code Sections 506(c) conditioned upon entry of the Final Order, 510, 549, 550, or 551, (b) shall not be subordinate to, or *pari passu* with, any lien that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code Section 551, and (c) shall be valid and enforceable against any trustee or any other estate representative appointed or elected in the Chapter 11 Case, upon the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "**Successor Case**"), and/or upon the dismissal of the Chapter 11 Case to the maximum extent permitted by law. The DIP Liens shall maintain their priority as provided in this Interim Order until the DIP Obligations have been indefeasibly paid in full in cash and completely satisfied and the DIP Lender's commitment has been terminated in accordance with the DIP Loan Agreement.

10.    The DIP Lender is afforded superpriority administrative claim status under Bankruptcy Code Sections 364(c)(1), having priority over any and all administrative expenses of the kind specified in Bankruptcy Code Section 105, 326, 328, 330, 331, 503(b), ~~506(c)~~, 507, ~~546(c)~~, 726, 1113 or 1114, subject and subordinate only to, upon the occurrence and during the continuance of an Event of Default, the payment of the Carve-Out (as defined below).

11.    Notwithstanding any provision of this Interim Order or the DIP Loan Agreement to the contrary, the DIP Liens granted to the DIP Lender pursuant to the DIP Loan Agreement and this Interim Order shall be subject to the Permitted Senior Liens as set forth in the DIP Loan Agreement and the "Carve-Out."

12.    "Carve-Out" means, at any time, the aggregate amount of the following: (a) all accrued and unpaid fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. §1930(a) plus interest pursuant to 31 U.S.C. § 3717, (b) an amount equal to $35,000 to compensate an examiner or a Committee or any of their Professionals for the costs of investigating the claims, if any, that Borrowers may have against the Lender, (c) all accrued and unpaid fees and disbursements of Professionals relating to the Chapter 11 Case incurred by persons or entities authorized to receive compensation under 11 U.S.C. §§ 330, 331 or 363, but limited to (i) subject to the Budget, all accrued and unpaid fees, disbursements costs and expenses of professional or professional firms retained by the Borrowers and the Committee accrued or incurred at any time before the date and time of the delivery by the Lender of a Carve-Out Trigger Notice, plus (ii) fees, costs and expenses incurred by the aforementioned after the date of delivery by the Lender of the Carve-Out Trigger Notice in an amount not to exceed $500,000, plus (iii) in all cases, whether before or after the date of delivery by the Lender of the Carve-Out Trigger Notice, any Deferred

10

Restructuring Fee (as defined in the SOLIC Engagement Letter) payable to SOLIC (as defined in the SOLIC Engagement Letter) pursuant to the SOLIC Engagement Letter, plus (d) if the Chapter 11 Case is converted to a case under Chapter 7 of the Code, all accrued and unpaid professional fees and disbursements relating to the case (following such conversion) by the trustee or successor trustee appointed pursuant to §701, §702 or § 703 of the Bankruptcy Code in an aggregate amount not to exceed $25,000 (it being understood that the limitation set forth in this clause (d) in no way serves as a limitation on any of the items described in clauses (a) through (c) above).

13.     Subject to entry of the Final Order, no costs or expenses of administration or other charge, lien, assessment or claim incurred on or after the Petition Date of any Person or entity (with the exception of the Carve-Out) shall be imposed against the DIP Lender, its claims or the DIP Collateral under Bankruptcy Code Section 506(c) or otherwise, and the Debtors hereby irrevocably waives any and all such rights, remedies and benefits under Bankruptcy Code Section 506(c) as to the DIP Lender, its claims or the DIP Collateral.

14.     The DIP Lender shall not be subject to the equitable doctrine of "marshaling", "election of remedies" or any other similar doctrine, in each case, with respect to any of its interest in the DIP Collateral.

15.     In accordance with the terms of the DIP Loan Agreement, the Debtors have agreed to grant a release and covenant not to sue to the Dip Lender, and its agents, representatives, subsidiaries, heirs, successors, and assigns from any claims each Debtor has, had, or may have against the DIP Lender, and the Dip Lender's related investment funds and management company, and their respective partners, shareholders, directors, managers, officers, employees, agents, advisors, representatives, heirs, successors and assigns, when

11

acting in a representative or official capacity on behalf of the DIP Lender (collectively the "Releasees"), based on facts arising on or before the date of the DIP Loan Agreement, that relate to: (I) the DIP Loan Agreement, the Loan documents, the prepetition loans or financings provided by the DIP Lender or any DIP Lender Related Persons to the Borrowers (directly or indirectly), or other transactions or dealings between any Borrower and the DIP Lender or any DIP Lender Related Person, (II) any transaction, action or omission contemplated by the DIP Loan Documents, or (III) any aspect of the dealings or relationships between or among the Debtors and the Releasees relating to the DIP Loan Agreement, the Loan documents, or any other transaction, action, dealings, or omissions contemplated hereby.  The release shall be binding unless within 75 days of the date of entry of the Final Order, a party, including the Committee, commences, as appropriate, a contested matter or adversary proceeding raising such claim, or must file a motion seeking standing to bring such a claim; provided, however, that any such actions or claims must be brought and, where applicable standing obtained, no later than the earlier of (a) 120 days from the entry of the Final Order or (b) June 30, 2017 (the "Challenge Period"). The Challenge Period may only be extended with the written consent of the DIP Lender (without need for Court Order or notice), or by order of the Court after notice and a hearing.  Upon the expiration of such applicable Challenge Period, to the extent not otherwise waived or barred: (A) any and all such claims by any party (including, without limitation, any Committee, any Chapter 11 trustee, and/or any examiner appointed in this Bankruptcy Case, and any Chapter 7 trustee and/or examiner appointed in any Successor Case), shall be deemed to be forever waived and barred.  The Final Order shall contain an injunction barring any Claims being asserted, or sought to be asserted, unless the conditions for bringing such Claims during the Challenge Period are met.

16.     As long as the DIP Loan Agreement remains in effect, the Debtors shall not seek, and it shall constitute an Event of Default under the DIP Loan Agreement if (among other Events of Default contained in the DIP Loan Agreement) the Debtors seek, or if there is entered, an order dismissing or converting the Chapter 11 Case to a case under another chapter of the Bankruptcy Code.  If an order dismissing or converting the Chapter 11 Case under Bankruptcy Code Section 1112 or otherwise is at any time entered (or any other Event of Default occurs), (a) the DIP Liens granted pursuant to this Interim Order to the DIP Lender shall continue in full force and effect, shall remain binding on all parties in interest notwithstanding such dismissal and (b) this Court shall, to the extent permitted by applicable law, retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such DIP Liens.

17.     Upon the occurrence of an Event of Default, and upon notice to the Debtors, counsel to the Committee, and the United States Trustee for the District of Delaware, the DIP Lender may exercise rights and remedies and take all or any of the following actions without further modification of the automatic stay pursuant to Bankruptcy Code Section 362 (which is hereby deemed modified and vacated to the extent necessary to permit such exercise of rights and remedies and the taking of such actions) in order to: (a) terminate the Commitment; (b) declare the DIP Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable); and/or (c) exercise any other right or remedy permitted to the DIP Lender under the DIP Loan Agreement, this Interim Order or by operation of law; provided, however, the DIP Lender may take the actions described in clause (c) above only after providing five (5) business days' prior written notice to the Court, the Debtors, and counsel to the Committee appointed in the Chapter 11 Case.

13

18.     The Debtors are authorized to perform all acts, and execute and comply with the terms of such other documents, instruments and agreements, as the DIP Lender may reasonably require, as evidence of and for the protection of the DIP Obligations, or which otherwise may be deemed reasonably necessary by the DIP Lender to effectuate the terms and conditions of this Interim Order and the DIP Loan Agreement.

19.     The Debtors and the DIP Lender shall be authorized to implement, in accordance with the terms of the DIP Loan Agreement, any amendment, consents, modifications or waivers of the DIP Loan Agreement **(including, without limitation, any amendment or supplement to the Budget)** which are not material and adverse to the Debtors or to MidCap, and the Debtors shall provide the United States Trustee for the District of Delaware, counsel to MidCap, and counsel to any Committee with prior written notice (and, to the extent practicable, not less than three (3) business days prior written notice) of such amendments, consents, modifications or waivers.  Any amendment, consent, modification or waiver of the DIP Loan Agreement which is material and/or adverse to the Debtors or MidCap, shall be subject to prior approval by this Court upon motion by the Debtors, after notice and a hearing.

20.     Having been found to be extending credit and making DIP Loans to the Debtors in good faith, the DIP Lender shall be entitled to the full protection of Bankruptcy Code Section 364(e) with respect to the DIP Obligations and the DIP Liens created or authorized by this Interim Order in the event that this Interim Order or any authorization contained herein is ~~stayed, vacated~~, reversed or modified on appeal.  Any ~~stay/modification~~, reversal ~~or vacation~~ *or modification* of this Interim Order shall not affect the validity of any ~~obligation of~~ *debt so incurred of* the Debtors to the DIP Lender incurred pursuant to, or ~~the grant of any protection afforded to the DIP Lender under,~~ *any priority or lien so granted under* this Interim Order, *unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.*

14

21.     The DIP Liens and all other rights and remedies of the DIP Lender and MidCap

as the prepetition lender granted by this Interim Order and the DIP Loan Agreement shall

survive entry of any order which may be entered (a) confirming any plan of reorganization in

the Chapter 11 Case (and the DIP Obligations shall not be discharged by the entry of any such

order or pursuant to Bankruptcy Code Section 1141(d)(4), the Debtors having hereby waived

such discharge); (b) converting the Chapter 11 Case to a case under Chapter 7; or (c) dismissing

the Chapter 11 Case; and the terms and provisions of this Interim Order as well as the DIP

Liens granted pursuant to this Interim Order and the DIP Loan Agreement shall continue in full

force and effect notwithstanding the entry of any such order, and such DIP Liens shall maintain

their priority as provided by this Interim Order until all of the DIP Obligations are indefeasibly

paid in full and discharged.

22.     Notwithstanding anything in this Interim Order to the contrary, the DIP Lender's

obligation to make DIP Loans in accordance with the DIP Loan Agreement shall automatically

terminate without any further action by this Court or the DIP Lender, upon the Termination

Date.

23.     The DIP Lender shall have no obligation to continue to provide postpetition

funding to the Debtors pursuant to the DIP Loan Agreement in the event that (among other

Events of Default) the Final Order approving the DIP Loan Agreement is not entered within

twenty (20) days after the Petition Date.

24.     Notwithstanding anything herein to the contrary, no Cash Collateral, Borrowings

or any portion of the Carve-Out may be used to assert any claims or causes of action against

MidCap as the prepetition lender or object to or contest in any manner, or raise any defenses to,

the validity, perfection, priority, extent or enforceability of the DIP Obligations, or the DIP Liens.

25.     The DIP Lender shall have the unqualified right to credit bid up to the full amount of DIP Loans in any sale of the DIP Collateral under or pursuant to (a) Bankruptcy Code Section 363, (b) a plan of reorganization or plan of liquidation under Bankruptcy Code Section 1129, or (c) a sale or disposition by a chapter 7 trustee under Bankruptcy Code Section 725.

26.     The DIP Lender and MidCap as the prepetition lender may, as applicable, petition this Court for any such additional protection they may reasonably require with respect to the DIP Obligations, the MidCap debt, or otherwise, including, without limitation, their rights to request additional adequate protection of their interests in the DIP Collateral and the MidCap collateral, as applicable.  Except as otherwise set forth herein, entry of this Interim Order shall not in any way constitute agreement, consent, or acquiescence by the DIP Lender or MidCap as the prepetition lender to the terms of any plan of reorganization filed in the Chapter 11 Cases.

27.     The Debtors shall pay all reasonable and documented fees, costs and expenses incurred by the DIP Lender as set forth in the DIP Loan Agreement, without regard to the amounts set forth with respect thereto in the Budget.  Payment of such fees shall not be conditioned on prior allowance by the Court.  Professionals for the DIP Lender (collectively, the "Lender Professionals") shall not be required to comply with the U.S. Trustee fee guidelines, but the Lender Professionals shall submit copies of invoices to the U.S. Trustee, counsel to the Committee (if applicable), and such other parties as the Court may direct, at least ten (10) days prior to payment by the Debtors.  If the Debtors, the U.S. Trustee, or the

Committee object to the reasonableness of the fees and expenses of any Lender Professional and cannot resolve such objection among themselves, the objecting party may file with the Court and serve on such Lender Professional an objection (the "**Fee Objection**") limited to the issue of reasonableness of such fees and expenses. The Debtors shall timely pay in accordance with the terms and conditions of this Interim Order the undisputed fees, costs and expenses reflected on any invoice to which a Fee Objection has been filed, and shall promptly pay such fees, costs and expenses that are subject to a Fee Objection upon resolution of such Fee Objection by the Court.

28.     Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary. In determining to make any loan (whether under the DIP Loan Agreement or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Agreement, neither the DIP Lender nor MidCap shall (a) be deemed to be in control of the operations of the Debtors, or (b) owe any fiduciary duty to the Debtors or their creditors, members, shareholders, or estates.

29.     The Final Hearing to consider entry of the Final Order is scheduled for February 21, 2017 at 3:00 p.m. (Eastern Time) before this Court.

30.     On or before February 7, 2017, the Debtors shall serve by United States mail, first-class postage prepaid (such service constituting adequate notice of the Final Hearing) (a) notice of the entry of this Interim Order and of the Final Hearing (the "**Final Hearing Notice**") and (b) a copy of this Interim Order, on the parties having been given notice of the Interim Hearing, to any other party that has filed a request for notices with this Court, to any

17

Committee, if the same shall have been appointed, or counsel to any such committee, and to all secured creditors, including taxing authorities who may hold secured claims. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of this Court no later than February 15, 2017, which objections shall be served upon (a) counsel to the Debtors, (i) Joel A. Waite, Young, Conaway, Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801-0391 and (ii) Grant T. Stein, Alston & Bird LLP, 1201 West Peachtree Street, Atlanta, GA 30309-3424; (b) counsel to the DIP Lender, Matt Bair, Miller, Egan, Molter & Nelson LLP, 221 West Sixth Street, Suite 700, Austin, TX 78701, (c) counsel to MidCap as the prepetition lender, Katie G. Stenberg, Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, TN 37219; (d) counsel to any Committee; and (e) the Office of the United States Trustee for the District of Delaware, in each case to allow actual receipt of the objection no later than February 15, 2017 at 4:00 p.m. (Eastern Time).

31.     Notwithstanding the possible applicability of Bankruptcy Rules 4001(a)(3) 6004(h), 7062 or otherwise, the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry.

32.     The terms of this Interim Order shall be binding (a) upon any trustee appointed in the Chapter 11 Case or (b) in any Subsequent Case.

33.     The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

Dated: February 3, 2017
        Wilmington, Delaware

LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE